### KINNEY *v.* SCARBROUGH COMPANY.

1. Where a selling agent of a company engaged in the manufacture and sale of maps, who had as his territory a certain State, except a few counties thereof, contracted that he would not, "without the consent of the company in writing, within six months after the termination of this contract, directly or indirectly, or in any capacity, whether upon his own account or in connection with any other person or persons, as salesman or agent of any character for any other person, company, or corporation, engage in any business of a character similar to that conducted by the company, which might in any manner be injurious to its interests," such a contract, without territorial limitation, was in general restraint of trade, and not enforceable.

2. If a salesman and local manager in a State for a non-resident corporation, by virtue of his position, became familiar with the business of the company and its customers, and took orders for the delivery of maps by such company; and if he subsequently, during the term for which he had contracted to serve such company, broke his contract with it, entered the service of another rival company in the same territory, failed to deliver to his former employer orders taken for its maps, and, being insolvent, intended to deliver maps of the second company on such orders, he could be enjoined from so doing.

3. If such an employee, after having broken his contract of employment, and being insolvent, was seeking to induce other employees of his former employer to breach their contracts of employment and to enter with him upon the service of the other company, he could be enjoined from so doing.

4. Direction is given that the injunction be modified in accordance with this decision.

APRIL 11, 1912.

Injunction.    Before Judge Pendleton.    Fulton superior court. May 23, 1911.

The Scarbrough Company, a corporation of the State of Maine, filed an equitable petition against C. L. Kinney, alleging in substance as follows: The defendant is indebted to the plaintiff in the sum of $727.96, on an itemized bill. He was employed by the plaintiff as salesman and local manager for the sale of maps, under a written contract, for a territory to be assigned to him. On or about January 1, 1911, the plaintiff assigned to him the territory of the State of Georgia, except nine counties thereof, which were attached to the Alabama territory, with the consent of the defendant. The contract contained the following clause: "It is further expressly agreed by and between the parties hereto, that, inasmuch as the company must, in the nature of the case, instruct the salesman as to its particular system and method of doing business, and communicate facts to him in confidence, said salesman shall not, without the consent of the company in writing, within six months after the termination of this contract, directly or indirectly, or in any capacity, whether upon his own account or in connection with any other person or persons, as salesman or agent of any character for any other person, company, or corporation, engage in any business of a character similar to that conducted by the company, which might in any manner be injurious to its interests." Under the terms of the contract, as amended by the agreement of the parties, the defendant was obligated to continue in the service of the plaintiff for at least one year from October 28, 1910. In order to equip the defendant for the discharge of his duties as salesman and manager for the plaintiff, it was necessary to impart to him information as to the confidential details of the plaintiff's business, which he expressly agreed to keep in confidence, and the possession of such information by the defendant in the service of a competing concern making and selling maps renders it impossible for the defendant to comply with his obligation to keep such information confidential. On February 13, 1911, the defendant wrote to the plaintiff, stating that he had 175 orders in Atlanta, and that thereafter he would report weekly. At the time this letter was written the defendant was either negotiating with a rival map company having its principal office in Atlanta, to enter its employment, or had already agreed to enter its employment. The defendant had

not complied with his duties as to sending in reports, etc.; and the plaintiff's treasurer determined to make a personal visit to Atlanta, to investigate the situation. On February 18, the defendant wrote to the treasurer, advising him not to come, that he had quit selling the plaintiff's maps, and it would be useless for the treasurer to make the trip. The treasurer nevertheless went to Atlanta, and advised the defendant of the irreparable injury that would follow to the plaintiff if the defendant insisted on taking employment with a rival or competitor, and endeavored to induce the defendant not to do so, but to continue in the service of the plaintiff. The defendant declined to do so, and entered the service of the rival company as an agent. The defendant failed and refused to report to the plaintiff the names and addresses of the persons from whom he secured the 175 orders. Such orders were procured by the defendant while actually in the service of the plaintiff. Upon information and belief the plaintiff charges that the defendant intends to fill such orders with the maps of the Hudgins Company, the rival company with which he has taken service, instead of furnishing the plaintiff with information with which it can fill such orders. New maps based on the census of 1910 will probably be delivered very shortly, and it is necessary to enjoin the defendant from delivering the maps of the Hudgins Company upon the orders taken for the plaintiff. The defendant is constantly endeavoring to "buy off" the salesmen and other agents and representatives of plaintiff in the territory of Georgia, and to induce them to breach their contracts with the plaintiff. The prayers were: that the plaintiff have judgment for the amount of its account against the defendant; that the defendant be enjoined from delivering any maps of the Hudgins Company on any orders taken by the defendant while in the employment of the plaintiff; that the defendant be enjoined from taking orders or engaging in the map business with the Hudgins Company, or with any other company making and selling maps in the territory of the State of Georgia, for a period of at least six months from the legal termination of the contract between the parties; that the defendant be enjoined from persuading or endeavoring to persuade the agents and salesmen of the plaintiff to leave its service, or from in anywise interfering with plaintiff's field officers or organization for the conduct of its business; and for process and general relief. By amendment it was alleged

that on May 16, 1911, the defendant filed his petition in voluntary bankruptcy, and was duly adjudged a voluntary bankrupt. It was also alleged that the plaintiff was engaged in the business of selling maps throughout the United States and Canada, with offices also in London and Paris.

The defendant denied breaking his contract, or that he had taken orders for the plaintiff which he intended to fill with maps of the Hudgins Company. He alleged, that, on or about December 20, 1910, he ceased to work for the plaintiff, and since that date has not worked for it or taken orders for it; that about February 23, the treasurer of the plaintiff expressly agreed with the defendant that the contract set out by the plaintiff was no longer binding upon either party, and expressly relieved the defendant of all responsibility or obligation under it; and that the treasurer offered to make an entirely new contract with the defendant, but after consideration the latter declined it. He denied that he had received any confidential or peculiar information or instructions from the plaintiff, and alleged that the nature of the services which he agreed to render were of an ordinary and not of an expert or peculiar nature. He set up that the only negative covenant contained in the contract, preventing his entering the service of another company after termination of his contract with the plaintiff, was in general restraint of trade, and not enforceable.

On the hearing conflicting evidence was introduced. The presiding judge granted the injunction prayed for by the plaintiff, upon its filing a damage bond in the sum of $1,000, if exception should be taken and the judgment reversed. The defendant excepted.

*Dorsey & Shelton,* for plaintiff in error.

*Smith, Hammond & Smith,* contra.

Lumpkin, J. (After stating the foregoing facts.)

1. Two divergent lines of decisions have arisen in regard to the territorial limitation necessary for the upholding of contracts in restraint of trade, in connection with a sale of a business and good will, the retiring of a partner, or the like. Two points of view affect this: first, looking at the matter with a special consideration of the parties immediately concerned and their protection; and second, viewing it from the standpoint of the public, and the interest which it has in the freedom of trade and in not having

parties cut off from a means of livelihood, thus tending to diminish the resources, wealth, and useful population of the State or country. In the earlier English cases the rule was quite stringently declared against contracts in restraint of trade, and it was thought to have been fully adjudicated that contracts in restraint of trade without territorial limitation would not be upheld, as being against public policy. Year Book 2 Henry V, pl. 26; Claygate v. Batchelor, Owen, 143; Price v. Green, 16 Mees. & W. 346. Contracts in restraint of trade within a limited area, and reasonable in their nature, came to be recognized and enforced as not being in general restraint. In later English cases the older ones have been explained as being cases in which the territory over which the restraint operated was greater than was necessary to protect the business of the contracting party. The earlier decisions had been followed in numerous jurisdictions before this explanation, and a number of courts adhered to the rule. It is considered in such jurisdictions, that, where the area within which the limitation operates is so large as to cause the public interest to suffer, the contract can not be upheld, although the business sought to be protected may extend over the entire area. On the other hand, some of the State and Federal courts have followed the modern English view, and hold that if the area over which the restraint is to operate is not greater than that covered by the business to be protected, it is not against public policy, although it may include the entire country. 1 Page, Contracts, §§ 376-379.

Without undertaking to discuss how large an area may be embraced in a contract in restraint of trade, if reasonably necessary for the protection of the good will of a business transferred, it is settled in this State that a contract in restraint of trade, without territorial limitation, is contrary to public policy and unenforceable. Civil Code (1910), § 4253; *Seay* v. *Spratling,* 133 *Ga.* 27 (65 S. E. 137). We are not now dealing with contracts of monopoly strictly so called, or contracts merely agreeing not to do business, without being ancillary to a sale of business or good will. They may involve another feature.

The jurisdiction of equity to enjoin a person from doing business or performing service of a certain character has generally been invoked under one of four heads: (1) Where there has been a sale of a business and good will, with an ancillary agreement by the seller

not to engage in the business in a certain territory. (2) Contracts by which an employee agrees to give his entire service to the employer, which sometimes include an express negative covenant not to serve any other person within a fixed time and territory. In such cases, the negative covenant will not be enforced by injunction, unless the services are of a peculiar merit or character, and can not be performed by others. *Hammond* v. *Georgian Co., 133 Ga.* 1 (65 S. E. 124). (3) Contracts binding one to desist from the practice of a learned profession. (4) A contract by an employee, ancillary to his contract of employment, not to engage in a competing business for himself or as an employee of another. In the present case the effort to obtain an injunction is made under the last head mentioned. The general principles as to territorial limitation upon restraint of trade above mentioned are applicable to all of the subdivisions of that topic, though each may have some differentiating features. Indeed the courts have shown greater reluctance in reference to enjoining a man from performing personal service or labor than from conducting a business.

It was contended in behalf of the defendant in error, that in *Rakestraw* v. *Lanier, 104 Ga.* 188, 201 (30 S. E. 735, 741, 69 Am. St. R. 154), a distinction was made between a contract binding one to desist from the practice of a learned profession and a contract binding a person who has sold out a mercantile or other kind of business, and the good will connected therewith, not to again engage in that business. This is true, but the distinction was not that in the former contract no limitation as to space was necessary, but that a reasonable limitation as to time was also necessary. After referring to contracts in general and partial restraint of trade, Mr. Justice Little said (p. 201) : "We test this contract by the rules before referred to, and find it supported by a legal consideration. Being limited as to space, although unlimited as to time, we find that it may properly be classed among contracts in partial restraint of trade. When we seek its terms to ascertain whether it is reasonable, made to protect the promisee, and not oppressive on the promisor, we find" that the facts were such as to render the limitation arbitrary and unreasonable. Thus it was held that, in such a case, not only must the restraint of trade be partial, and not general, but it must also be proportioned to the legitimate object to be subserved, and not unreasonable in character. If the doctrine of that case be

applied to the present one, it will not help the plaintiff. We are aware that there are a number of cases which have sustained agreements, ancillary to employment, that the employee would not enter into the service of a competitor or rival of the employer for a specified time after leaving his service. In some of them there was a limitation as to space. In some, courts which follow the modern English rule, above mentioned, looked at the matter from the standpoint of reasonable protection entirely. But we are of the opinion that our decisions require a limitation as to space, and that this rule applies to the present case as well as to one in which there has been a sale of property and good will. We therefore hold that the provision of the contract here involved, which was unlimited as to space, was not enforceable.

2. It does not appear that any secret formula or technical trade secrets were involved. But there was evidence tending to show that the defendant, by virtue of his position, had acquired knowledge of the customers of the plaintiff; that, while pretending to be acting in its interest, informing it that he had taken a number of orders, and promising to make reports, he had actually contracted to represent a rival company; that he pursued a policy of double dealing for some time; that, when he finally left the employment of the plaintiff, and notified it of the fact, he failed to deliver to it the orders which he previously reported that he had taken; and that he intended to fill such orders with maps furnished by his new employer. This can be prevented by injunction; and on the interlocutory hearing the questions of fact involved were for the consideration of the presiding judge.

3. Furthermore there was evidence tending to show that the defendant had sought to induce his successor in the employment of the plaintiff to violate the contract of employment with the plaintiff, and to join him in the new employment; and that he boasted that he had induced some of the plaintiff's employees to leave its service and take positions with the new employer. As if to emphasize the fact that the plaintiff had no adequate remedy at law for the injuries thus done, the defendant proceeded to go into voluntary bankruptcy. Aside from the question of restraint of trade involved in the preceding discussion, such conduct on the part of a trusted employee furnished sufficient basis to authorize a temporary injunction as to this matter. It is true that the defendant denied

most of the allegations of the plaintiff, and claimed that he had been voluntarily released from its service. But the presiding judge was not compelled to accept his theory of the transaction, and there was sufficient evidence on which to base an injunction touching the matters last mentioned.

It was argued on behalf of the defendant that injunction should not be granted to protect the contracts of the plaintiff with its other employees against interference by this insolvent ex-employee; and in support of this position were cited the cases of *Stein* v. *National Life Association,* 105 *Ga.* 821 (32 S. E. 615, 46 L. R. A. 150), and *Jones* v. *Van Winkle Gin & Machinery Co.,* 131 *Ga.* 336 (62 S. E. 236, 17 L. R. A. (N. S.) 848, 127 Am. St. R. 235). But in each of those cases it was distinctly declared that no question of inducing violation of contracts was involved. On the general subject see Beekman *v.* Marsters, 195 Mass. 205 (80 N. E. 817, 11 L. R. A. (N. S.) 201 and note, 122 Am. St. R. 232, 11 Ann. Cas. 332) ; *Employing Printers Club* v. *Doctor Blosser Co.,* 122 *Ga.* 509 (50 S. E. 353, 69 L. R. A. 90, 106 Am. St. R. 137, 2 Ann. Cas. 69).

4. In so far as the injunction restrained the defendant from taking orders or engaging in the map business with the second company for six months from the termination of the contract existing between him and the plaintiff, it must be reversed. In so far as it was sought to enjoin the defendant from delivering maps of the new company on orders taken by the defendant while in the employment of the plaintiff, and from inducing or endeavoring to induce the agents and salesmen of the plaintiff to violate their contracts with the plaintiff, and leave its service in violation thereof, the injunction was authorized. Direction is given that the injunctive order be so modified as to accord with this decision.

The plaintiff in error, having obtained a material modification of the judgment, is entitled to costs of the exception.

*Judgment affirmed in part, and reversed in part, with direction. All the Justices concur.*